(No. 48120.-

JOSEPH McGOVERN, Appellant, v. JOSEPH D. STAND-
ISH, Appellee.

*Opinion filed October 1, 1976.*

GOLDENHERSH, J., dissenting.

Callis, Schooley, Filcoff and Hartman, of Granite City (William W. Schooley, of counsel), for appellant.

O'Connell & Waller, of Belleville (John F. O'Connell, of counsel), for appellee.

MR. JUSTICE CREBS delivered the opinion of the court:

The issue in this case involves the scope of an architect's liability under the Structural Work Act (Ill. Rev. Stat. 1969, ch. 48, par. 60 *et seq.*).

The plaintiff, Joseph McGovern, filed suit against the defendant, Joseph D. Standish, as a result of injuries sustained by the plaintiff in a fall from a scaffold at a construction site. In count I of his complaint, the plaintiff alleged that the defendant had entered into a contract with St. Elizabeth's Hospital to perform certain architectural services in connection with the construction of an addition to the hospital, which is located in Granite City, Illinois. In particular, the plaintiff alleged that the defendant had agreed to perform certain duties of inspection and supervision relating to the execution of a contract between the hospital and S. M. Wilson and Company, a general contracting firm hired by the hospital to undertake the construction of the hospital addition. The plaintiff further alleged that, on June 4, 1969, in the course of his employment as an ironworker for Wilson, he was placing reinforcing steel rods in the walls of the hospital addition when the scaffold upon which he was standing tipped to one end, causing him to fall to the ground. Finally, the complaint alleged that the defendant was a person having charge of the work within the meaning of the Structural Work Act (hereinafter referred to as the Act), that the defendant had failed to comply with the Act in several particulars, and that, as a direct and proximate result of the defendant's violation, the plaintiff had suffered serious and permanent injury. Count II of the complaint was based upon allegations of negligence and is not here at issue.

The defendant filed an answer in which he denied that he had agreed to perform the aforementioned duties of inspection and supervision, that he had been in charge of the work within the meaning of the Act, or that he had violated the Act in the manner alleged.

The case was tried before a jury in January, 1974. At the close of all the evidence, the defendant moved for a directed verdict. This motion was denied, and the jury returned a verdict for the plaintiff in the amount of $35,000. The defendant's post-trial motion for judgment notwithstanding the verdict or, in the alternative, a new trial, was denied. On appeal, the Appellate Court for the Fifth District reversed, with one justice dissenting. (*McGovern v. Standish*, 33 Ill. App. 3d 717.) We have granted the plaintiff leave to appeal from the judgment of the appellate court.

Although the defendant raised a number of other issues before the appellate court, the sole basis for the appellate court's decision was its determination that the defendant was not a person having charge of the work within the meaning of the Act. Hence the sole issue before this court is the propriety of that determination. Accordingly, we must review the evidence adduced at trial and determine whether that evidence, when viewed in the light most favorable to the plaintiff, so overwhelmingly favors the defendant that no contrary verdict based on that evidence could ever stand. *Pedrick v. Peoria and Eastern R.R. Co.*, 37 Ill. 2d 494.

The first witness to testify at trial was the plaintiff, who testified primarily to the factual circumstances surrounding his employment and the incident in question. The plaintiff stated that he had worked at the construction site for a three to four week period prior to the time of the accident. Regarding the defendant, the witness testified that he had never seen the defendant on the job, that he took orders from his foreman, Wesley Dix, and that he had never taken any orders from the defendant. The plaintiff

also stated that he had no personal knowledge concerning the relationship between the defendant and any other person on the job.

James Roach testified that he was an ironworker employed by S. M. Wilson at the same construction site as was the plaintiff. Roach stated that he took orders from Dix, his foreman, who was the only person, to his knowledge, in charge of the work in that area. Asked during cross-examination if he had seen or taken orders from "this gentleman" during his eight months on the job, the witness replied in the negative. While counsel presumably intended to refer to the defendant, the identity of the individual in question is not clarified in the record.

The next witness was the defendant, Joseph Standish, who was called to testify as an adverse witness. The defendant testified that he had entered into a contract with the Sisters of Divine Providence to perform architectural services in connection with the construction of an addition to St. Elizabeth's Hospital. Subsequently, he prepared a contract to be entered into between the Sisters and the contracting firm selected to undertake the construction. Incorporated into that contract were certain general conditions and specifications. The witness testified that these conditions and specifications were standard provisions used by the Public Health Service and required to be included pursuant to Federal law. The defendant also testified that working drawings for the construction were prepared under his direction. The witness identified a letter sent by him to S. M. Wilson and Company, the successful bidder, authorizing the latter to proceed with the construction in accordance with the contract. He also identified the contract executed by Wilson and Sister Mary Marce, on behalf of the Sisters of Divine Providence, together with his signature as an attesting witness.

In addition, the defendant testified that he had a project inspector at the construction site who was hired by him at the direction of the hospital. He had discharged the

first inspector at the request of the hospital and then hired a second inspector agreeable to the hospital. The second inspector, Ron Earl, was a full-time employee but had only been on the job for two or three days as of the date of the plaintiff's accident. The defendant stated that he had paid Earl's salary, which was to be reimbursed by the hospital.

On redirect examination, the defendant stated that authorization by the owners was necessary before an inspector could be employed. He explained that the inspector's duties were to familiarize himself with the plans and specifications, observe the construction work as it proceeded, discuss the construction and any problems thereto with the contractor's superintendent and the defendant, and generally see that the end result might be a "representation of the working drawings and specifications prepared by the architect." The inspector did not have any authority, however, to instruct any of the workmen in their duties or to shut down the work. As architect, the defendant's duty was to see that the end result conformed with the plans and specifications.

A deposition by Dr. Alan Morris was read to the jury. Dr. Morris, a physician, related the treatment he had given the plaintiff, his opinion as to the cause of the plaintiff's injury, and his prognosis for the plaintiff's recovery.

The plaintiff's final witness was Frank McGinness, the controller of St. Elizabeth's Hospital, who testified that the defendant had billed the hospital for "professional services rendered in supervision of the additions and alterations to St. Elizabeth Hospital." According to McGinness, the defendant did not bill the hospital separately for salaries of the two inspectors hired.

The defendant testified once again on his own behalf. He stated that any decisions he might make regarding the contract or specifications, or any warnings or notices he might give, were subject to arbitration, pursuant to the terms of the General Conditions. The defendant also stated that he never gave an order to any of the employees of the

general contractor or the subcontractors. He acknowledged, nevertheless, that at times it became necessary to discuss matters with the general contractor or the subcontractors. The witness also testified that erection of the scaffolding was generally the responsibility of the general contractor. Finally, the defendant admitted that he made numerous decisions regarding the construction of the addition, but only within the purview of the contract as he understood it.

The last witness to testify was Roy Pixley, construction manager for S. M. Wilson and Company. Pixley testified that he and other representatives of Wilson submitted a list of subcontractors to the defendant for his approval. He characterized this procedure as one accepted on virtually all construction jobs. The witness stated that Wilson imposed the responsibility for ensuring safety directly upon its superintendents. As the person in charge of the superintendents, he too shared in that responsibility. Asked who was in charge of the work insofar as S. M. Wilson was concerned, Pixley replied that direct supervision at the job site was exercised by Ward Borror, the project superintendent, who answered to him as construction manager. Below the two of them were various foremen and subsuperintendents, as well as the subcontractors, over whom they also exercised supervision. Pixley testified that erection of the scaffolding was the responsibility of the contractor and that ironworkers, as a matter of custom and practice, insist on building themselves the scaffolding upon which they would work. The witness stated that he believed that the defendant had the right to stop the work if it were not being performed correctly. However, he also admitted that the General Conditions contained no direct recognition of such authority. Pixley acknowledged that the General Conditions provided an arbitration mechanism for the settlement of all disputes, including those involving the architect. In Pixley's view, any decision by the architect to stop the work would be

subject to arbitration.

The witness identified a letter sent to the defendant, certifying that all temporary shoring, scaffolding, hoists and like items would be designed to support all dead loads plus a 50% safety factor. This letter, required by the specifications, was requested by the defendant and sent by Pixley, on behalf of Wilson.

Pixley further testified that the defendant had not, to his recollection, given any direction or order regarding the details or manner in which the work should be executed. He stated that the defendant was on the job numerous times and generally at least weekly. At times, he requested the defendant to meet him at the job site to discuss matters such as the defendant's interpretation of the contract documents and drawings. He also elicited the defendant's recommendations concerning solutions to problems which developed on the job. The defendant examined the work, according to Pixley, in order to ascertain whether there was compliance with the specifications.

During cross-examination, the witness stated that, since the defendant was concerned about compliance with the specifications, he assumed that the defendant was concerned about those specifications relating to the scaffolding.

Portions of the relevant contractual agreements were read to the jury. The contract between the defendant and the Sisters of Divine Providence contained these provisions:

> "The Architect's professional services consist of the necessary conferences, the preparation of preliminary studies, working drawings, specifications, large scale and full size detail drawings, for architectural, structural, plumbing, heating, electrical, and other mechanical work; assistance in the drafting of forms of proposals and contracts; the issuance of Certificates for Payment; the keeping of accounts and the general administration of the construction contracts.
>
>        \* \* \*

The Architect will endeavor by general administration of the construction contracts to guard the Owner against defects and deficiencies in the work of the contractors, but he does not guarantee the performance of their contracts. The general administration of the Architect is to be distinguished from the continuous on-site inspection of a Project Inspector.

When authorized by the Owner, a Project Inspector acceptable to both Owner and Architect shall be engaged by the Architect at a salary satisfactory to the Owner and paid by the Owner, upon presentation of the Architect's monthly statements."

Included in the General Conditions of the contract between the Sisters and Wilson were the following provisions:

"Paragraph 4. *Access to the work.*

The Architect, the Surgeon General and \*\*\* the State agency and their authorized representatives shall have access at all times to the work for inspection whenever it is in preparation or progress, and the contractor shall provide proper facilities for such access and inspection.

Paragraph 5. *Supervision.*

All work shall be done under the supervision of the Architect designated by the Owner. The Architect shall determine the amount, quality, acceptability, and fitness of all parts of the work, shall interpret the Specifications, Contract Documents, and any Extra Work Orders, and shall decide all other questions in connection with the work. The Architect shall have no authority to approve or order changes in the work which alter the terms or conditions of the contract. Upon request, the Architect shall confirm in writing any oral order, direction, requirement, or determination.

Paragraph 6. *Architect's Decisions.*

(a) It shall be the responsibility of the Architect to make written decisions in regard to all claims of the Owner or Contractor and to interpret the Contract Documents on all questions arising in connection with the execution of the work.

(b) Except as otherwise specified, all the Architect's decisions or interpretations of contract requirements are

subject to arbitration.

Paragraph 20. *Accident Prevention.*

*** The safety provisions of applicable laws *** shall be observed. Machinery, equipment and all hazards shall be guarded or eliminated in accordance with the provisions of the latest edition of the Manual of Accident Prevention in Construction, published by the Associated General Contractors of America. ***

Paragraph 23. *Responsibility of Contractor to Act in Emergency.*

In case of an emergency which threatens loss or injury of property, and/or safety of life, the Contractor shall act, without previous instructions from the Owner or Architect, as the situation may warrant. He shall notify the Architect, as the situation may warrant. He shall notify the Architect thereof immediately thereafter.

Paragraph 31. *Owner's Right to Stop Work or Terminate Contract; Delays, Damages.*

(a) If *** (3) the Contractor shall refuse or fail, after Notice of Warning from the Architect, to supply enough properly skilled workmen, or proper materials, or *** (6) the Contractor shall fail or refuse to regard laws, ordinances, or the instructions of the Architect, or otherwise be guilty of a substantial violation of any provision of this contract, then, and in any such event, the Owner, upon the certificate of the Architect that sufficient cause exists to justify such action, and without prejudice to any other rights or remedy he may have, may by 10 days' notice to the Contractor, terminate the employment of the Contractor and his right to proceed, either as to the entire work or (at the option of the Owner) as to any portion thereof as to which delay shall have occurred, and may take possession of the work and complete the work by contract or otherwise, as the Owner may deem expedient.

Paragraph 35. *Shop Drawings.*

(a) The Contractor shall submit, for the approval of the Architect, shop and setting drawings and schedules required by the specifications or that may be requested by the Architect and no work shall be fabricated by the Contractor, save at his own risk, until such approval has been given.

Paragraph 37. *Standards.*

(c) Notwithstanding any reference in the specifications to any article, device, product, material, fixture, form, or type of construction by name, make, or catalog number, such references shall be interpreted as establishing a standard of quality and shall not be construed as limiting completion; and the Contractor, in such cases, may at his option use any article, device, product, material, fixture, form, or type of construction which in the judgment of the Architect expressed in writing is equal to that specified.

Paragraph 38. *Samples.*

(a) The Contractor shall furnish for the approval of the Architect any samples required by the specifications or that may be requested by the Architect, of any and all materials or equipment he proposes to use ***.

Paragraph 39. *Laboratory Tests.*

(a) Any specified laboratory tests of material and finished articles to be incorporated in the work shall be made by bureaus, laboratories or agencies approved by the Architect, and the reports of such tests shall be submitted to the Architect.

Paragraph 49. *Superintendence by Contractor.*

The Contractor shall give his personal superintendence to the work or have a competent foreman or superintendent, satisfactory to the Architect, on the work at all times during progress, with authority to act for him.

Paragraph 50. *Inspection.*

All material and workmanship (if not otherwise designated by the specifications) shall be subject to inspection, examination, and test by the Architect at any and all times during manufacture and/or construction and at any and all places where such manufacture and/or construction are carried on. The Architect shall have the right to reject defective material and workmanship or require its correction."

The Special Conditions of the contract between the Sisters and Wilson provided that, *inter alia,* the architect may direct removal of towers and hoisting equipment and removal, plugging or capping of inactive and abandoned utilities; the contractor shall submit to the architect a description of the methods, sequence of erection, and type of equipment proposed for use in erection of structural

steel work; all work must be done to the complete approval of the architect, with no deviation from the plans and specifications without his written approval; and the architect may request removal of rubbish. The architect was also recognized as having the right to disapprove of proposed subcontractors upon reasonable objection. In addition, the Special Conditions contained the following provision:

"Paragraph 5. *Temporary Scaffolds, Staging and Safety Devices.*

(a) Provide, erect, maintain and remove when directed, all scaffolding, staging, platforms, temporary runways ***, as required by local and state codes, or laws, for the protection of workmen and the public. The construction, inspection and maintenance of the above items shall comply with all safety codes and regulations as applicable to the project."

Section 9 of the Structural Work Act imposes civil liability for wilful violations of the Act, or wilful failure to comply with any of its provisions, upon "[a]ny owner, contractor, sub-contractor, foreman or other person having charge of the erection, construction, repairing, alteration, removal or painting of any building, bridge, viaduct or other structure within the provisions of this act ***." (Ill. Rev. Stat. 1969, ch. 48, par. 69.) Construing this language, we have stated that "the legislature intended to hold liable those named persons who are in charge of the work, and the words 'or other person' were included to cover the situation where someone other than the named persons was in charge of the work, in order to prevent such person from escaping liability." *Gannon v. Chicago, Milwaukee, St. Paul and Pacific Ry. Co.*, 22 Ill. 2d 305, 319.

Whether a defendant is a person "having charge of" the work within the meaning of the Act is primarily a factual question. (*Voss v. Kingdon and Naven, Inc.*, 60 Ill. 2d 520, 525.) Since the term "having charge of" is one of common usage and understanding, it has not been specifically defined by this court. (*Larson v. Commonwealth*

*Edison Co.,* 33 Ill. 2d 316, 323.) Moreover, we have not delimited those factors to be considered in any definition of the term. (*Warren v. Meeker,* 55 Ill. 2d 108, 111.) Nevertheless, before a defendant may be found to be in charge of the work, there must be a showing that he had some direct connection with the construction operations. (*Larson v. Commonwealth Edison Co.,* 33 Ill. 2d 316, 324.) In addition, the defendant must have been in charge of the particular operations which involved the violation from which the alleged injury arose. *Warren v. Meeker,* 55 Ill. 2d 108, 111; *Carruthers v. B. C. Christopher & Co.,* 57 Ill. 2d 376, 378.

The case upon which the plaintiff chiefly relies, and that which must be the focus of our attention, is *Miller v. DeWitt,* 37 Ill. 2d 273. In *Miller,* the plaintiffs were injured when the roof of a school gymnasium upon which they had been working collapsed. The plaintiffs, employees of the contractor hired to remodel the gymnasium, brought an action against, *inter alia,* the architects who had undertaken the design and supervision of the remodeling. Recovery was sought on the basis of common law negligence and alleged violations of the Structural Work Act. The jury returned a verdict for the plaintiffs, and the appellate court affirmed. On appeal, as to this issue, this court affirmed the judgment of the appellate court.

The greater part of this court's opinion in *Miller* is devoted to a factual recitation and discussion of issues not pertinent to this case. The issue of whether the defendant architects had been in charge of the work within the meaning of the Structural Work Act was succinctly disposed of in a short paragraph, wherein the court declared:

> "We also believe that what we heretofore have said regarding the architects' right to stop the work if it were being done in a dangerous manner makes them persons 'having charge' within the meaning of the act. (*Larson v. Common-*

*wealth Edison Co.,* 33 Ill. 2d 316.) We therefore conclude that the trial court did not err in refusing to direct a verdict for defendants on the statutory counts." (37 Ill. 2d 273, 286.)

This language cannot be examined apart from the factual posture of the case. In *Miller,* we were called upon to determine whether sufficient evidence had been presented to create a jury question on the allegations made by plaintiffs. This court found a sufficient quantum of evidence and, in so doing, stressed the right afforded the defendants to stop the work. However, we do not read *Miller* as holding that the right to stop the work, without more, is conclusive in resolving the question of whether a person has charge of the work within the meaning of the Act. (See *Voss v. Kingdon and Naven, Inc.,* 60 Ill. 2d 520, 526-27; *McInerney v. Hasbrook Construction Co.,* 62 Ill. 2d 93, 103-04.) Rather, such a determination must rest upon an assessment of the totality of the circumstances.

Furthermore, we do not believe that the defendant in the instant case had the right to stop the work, in the sense that the right was discussed in *Miller.* In *Miller,* we referred to "the architects' right to stop the work *if it were being done in a dangerous manner* ***." (Emphasis added.) (37 Ill. 2d 273, 286.) The record in the instant case does not establish that the defendant had any comparable right. The defendant was recognized as having the right to reject defective materials and workmanship and require its correction. Even if we read into this clause a right to stop the work in the case of improper construction, a reading by no means compelled by the language employed, it does not follow that the defendant had the right to stop the work where dangerous methods not affecting the quality of the construction were utilized. Also, while the architect could certify to the owner that sufficient cause existed for the termination of the contractor's employment and the stopping of the work, the clause so providing allowed action only by the owner and only then upon 10 days'

notice to the contractor. Clearly, this clause does not permit the type of immediate cessation or suspension of activity contemplated by *Miller*.

*Voss v. Kingdon and Naven, Inc.*, 60 Ill. 2d 520, also relied upon by the plaintiff, is similarly distinguishable. There the defendant engineering firm had "broad and sweeping" authority over the work, including the right to compel discharge of workmen and the right to suspend the work, in whole or in part, for such time and under such circumstances as the defendant deemed warranted. (60 Ill. 2d 520, 527.) No such expansive authority was given to the defendant herein.

In addition to those factors present in *Miller* and *Voss* and absent here, we note that the evidence does not establish that the defendant had any right to control or direct the manner or methods by which the construction would be accomplished. Moreover, the undisputed testimony at trial was to the effect that the defendant had never attempted to exercise any control over the work by issuing orders or directives to those associated with the construction. Indeed, all of the evidence adduced at trial is consistent with the view that the defendant's function was limited to generally overseeing the work in an effort to ensure that the completed project conformed with the plans and specifications.

It is true that the contract between the Sisters and Wilson recognized in the defendant a right to supervise the work. But, as a general rule, even the "duty to 'supervise the work' merely creates a duty to see that the building when constructed meets the plans and specifications contracted for." (*Miller v. DeWitt*, 37 Ill. 2d 273, 284.) The right to inspect the work, also given the defendant, is but ancillary to the defendant's right to supervise. These rights, as afforded the defendant in this case, cannot alone form a basis for a finding of coverage under the Act.

We realize that the Act has traditionally been given a liberal construction in order to effectuate the legislative

purpose of protecting the construction worker. (See, *e.g.,* *Davis v. Commonwealth Edison Co.,* 61 Ill. 2d 494, 498; *McNellis v. Combustion Engineering, Inc.,* 58 Ill. 2d 146, 151; *Halberstadt v. Harris Trust & Savings Bank,* 55 Ill. 2d 121, 127.) Yet we have also held that the Act was not intended "to cover any and all construction activities whatsoever" (*Crafton v. Lester B. Knight & Associates, Inc.,* 46 Ill. 2d 533, 536), nor was it intended to predicate a duty, and thus a corresponding liability for its violation, upon mere ownership of the premises upon which construction is undertaken (*Kobus v. Formfit Co.,* 35 Ill. 2d 533, 537). Were the defendant to be held in charge of the work on these facts, he would in essence be subjected to liability as a result of his status as a supervising architect alone. In our view, the imposition of such an onerous burden is neither in keeping with, nor required by, the salutary purpose underlying the Act.

Viewing all of the evidence in the light most favorable to the plaintiff, we conclude that the evidence so overwhelmingly favors the defendant that it was error for the trial court to deny the defendant's motion for judgment notwithstanding the verdict. Accordingly, the judgment of the appellate court is affirmed.

*Judgment affirmed.*

MR. JUSTICE GOLDENHERSH, dissenting:

I dissent. On this record the question whether defendant was one of the persons having "charge of the work" was for the jury. I find it anomalous that having consistently refused to define the term "having charge of" (*Larson v. Commonwealth Edison Co.,* 33 Ill. 2d 316, 323; *Warren v. Meeker,* 55 Ill. 2d 108,111), and having refused to approve an instruction defining the term (see Illinois Pattern Jury Instructions, Civil No. 180.16 (2d ed. 1971) the majority, with almost equal consistency (see *Van Dekerkhov v. City of Herrin,* 51 Ill. 2d 374; *Carruthers v. B. C. Christopher & Co.,* 57 Ill. 2d 376), is so readily able

to decide what it does not mean.

The majority states:

> "Whether a defendant is a person 'having charge of' the work within the meaning of the Act is primarily a factual question. (*Voss v. Kingdon and Naven, Inc.*, 60 Ill. 2d 520, 525.) Since the term 'having charge of' is one of common usage and understanding, it has not been specifically defined by this court. (*Larson v. Commonwealth Edison Co.*, 33 Ill. 2d 316, 323.) Moreover, we have not delimited those factors to be considered in any definition of the term. (*Warren v. Meeker*, 55 Ill. 2d 108, 111.) Nevertheless, before a defendant may be found to be in charge of the work, there must be a showing that he had some direct connection with the construction operations. (*Larson v. Commonwealth Edison Co.*, 33 Ill. 2d 316, 324.) In addition, the defendant must have been in charge of the particular operations which involved the violation from which the alleged injury arose. *Warren v. Meeker*, 55 Ill. 2d 108, 111; *Carruthers v. B. C. Christopher & Co.*, 57 Ill. 2d 376, 378."

Unless this last statement means that one in overall charge also has charge of "the particular operations which involved the violation from which the alleged injury arose" it is clearly erroneous, finds no support in either *Warren* or *Carruthers* and states precisely the opposite of IPI Civil No. 180.02.

In *Larson v. Commonwealth Edison Co.*, 33 Ill. 2d 316, the court said:

> "While it may be conceded that some of the decisions in this jurisdiction involving the Scaffold Act appear to have equated 'having charge' with 'supervision and control' in varying degrees, it is our opinion the language of the statute, and the legislative intent it reflects, do

not permit the conclusion that the terms are the inflexible and unbending legal equivalent of the other. The term 'having charge of' is a generic term of broad import, and although it may include supervision and control, it is not confined to it. As was said of the word 'charge' in *People v. Gould*, 345 Ill. 288, 323: 'The word does not necessarily include custody, control or restraint, and its meaning must be determined by the associations and circumstances surrounding its use. "To have charge of" does not necessarily imply more than to care for or to have the care of.' Thus, while the actual exercise of supervision and control over the work and the persons doing it, or the retention of the right to so supervise and control, may be factors bearing on the ultimate factual question of whether an owner is 'in charge,' they are not necessary or conclusive factors, nor is either made a *sine qua non* for liability under the statute. Rather, consistent with its beneficent purpose of preventing injury to persons employed in the extra-hazardous occupation of structural work, the thrust of the statute is not confined to those who perform, or supervise, or control, or who retain the right to supervise and control, the actual work from which the injury arises, but, to insure maximum protection, is made to extend to owners and others who have charge of the erection or alteration of any building or structure." 33 Ill. 2d 316, 321-22.

The contract here involved does not support the majority's conclusion that defendant's supervisory duties were limited to determining "that the building when constructed meets the plans and specifications contracted for." (65 Ill. 2d at 69.) The record shows that under the contract all work was to be done under defendant's

supervision, that defendant employed a full-time project inspector, and that the owner "upon the certificate of the Architect that sufficient cause exists to justify such action *** may *** terminate the employment of the contractor." The contractor was required to observe the "safety provisions of applicable laws," and under his authority to interpret the contract documents, defendant had the power to determine whether he was doing so.

IPI Civil No. 180.02 provides:

> "Under the statute I have just read to you, it is possible for more than one person to 'have charge of' the work. One or more persons can have charge of the overall work, and other persons can have charge of the phase of the work in connection with which an injury occurs. In that event, all of them would 'have charge of' the work within the meaning of the statute.
>
> Who had charge of the work under the particular facts of this case is for you to decide."

The Committee Comment states:

> "More than one person may 'have charge of' the work. Both a person in charge of the overall work and a person in charge of a phase of the work may be liable under the Act."

Under *Larson v. Commonwealth Edison Co.*, 33 Ill. 2d 316, defendant could be a person "having charge of the work" and this record would support the finding that he had a "direct connection with the construction *** operations" (*Larson* at 324) and that he was in charge of the overall work.