IRVIN L. NORTON, Plaintiff-Appellee, *v.* WILBUR WAGGONER EQUIPMENT RENTAL & EXCAVATING CO. *et al.*, Defendants.— (COLLINSVILLE COMMUNITY UNIT DISTRICT NO. 10, MADISON & ST. CLAIR COUNTIES, Defendant-Appellant.)

Fifth District   No. 75-293

Opinion filed August 31, 1977.

G. MORAN, J., dissenting.

Burroughs, Simpson, Wilson, Hepler & Broom, of Edwardsville, for appellant.

Earl L. Vuagniaux, of Edwardsville, for appellee.

Mr. JUSTICE JONES delivered the opinion of the court:

Defendant, Collinsville Community Unit District No. 10 (hereinafter, the School District) appeals from a judgment entered in favor of plaintiff, Irvin L. Norton, after a jury trial in the circuit court of Madison County. The jury's verdict and award of $175,000 was predicated upon the alleged liability of the School District under the Structural Work Act (Ill. Rev.

Stat. 1971, ch. 48, par. 60 *et seq.*) for injuries of the plaintiff sustained while working at a construction site on premises owned by the School District.

Defendant School District's post-trial motion for judgment notwithstanding the verdict or, in the alternative, a new trial, was denied, as were two motions for directed verdict made during trial.

Prior to verdict, two other defendants were dismissed without prejudice upon motion of the plaintiff. Wilbur Waggoner Equipment Rental and Excavating Company, a subcontractor that supplied a crane and operator to the construction site, entered into a loan receipt agreement with Mr. Norton and was dismissed out of the case prior to trial. Architectural Associates, Incorporated, the architectural firm that drew up the plans and specifications for the project, was dismissed during trial.

In June of 1971 construction was underway on a new high school in Collinsville, Illinois. Included in this project was the erection of a vocational building, referred to at trial as "E Building." Mr. Norton's employer, R and R Construction Company, was the general contractor for the project pursuant to a contract between it and the School District.

On June 25, 1971, Mr. Norton was engaged in "spotting" bundles of roofing material across the bar joists of the unfinished roof of E Building. He had performed the same task the day before. A crane was used to lift the bundles to the top of the building. Two straps, one at each end of the bundle in order to balance the load, were looped onto an 8- to 10-inch hook located on the crane's cable immediately beneath a steel "headache ball," 10 to 12 inches in diameter, weighing between 80 and 100 pounds. Since the crane operator's view of Mr. Norton was obstructed by a wall of the building, Mr. Norton's instructions for placement of the bundles were relayed to the operator by a signalman who was perched upon the wall.

Once a bundle was set upon the bar joists, Mr. Norton's job was to disconnect the straps, remove them from the load and toss them to the ground, some 23 feet below. The only surface plaintiff had to stand upon while completing this operation was supplied by the bar joists themselves. Each joist provided a flat steel surface approximately 4½ inches in width. These joists were spaced approximately 3½ to 4 feet apart and ran the length of the building. Around 9:30 a.m. Mr. Norton crawled onto a bundle to shove off a strap on the far end of a load. According to eyewitnesses, while he was so positioned the headache ball was lowered onto his back.

Examination of his back immediately revealed a red mark, and in less than half an hour he was in great pain and was rushed to a doctor's office. On July 4, 1971, he was hospitalized and subsequently underwent a serious operation upon his spine called a laminectomy. He was

readmitted to the hospital on two occasions in 1972 when his back condition was aggravated by mishaps at work.

The plaintiff's primary theory at trial was that the School District violated the Structural Work Act by failing to provide a scaffold, support or planking when under the circumstances one or another was required to protect the plaintiff from injury. The implication from the evidence being that if a supporting device had been provided, the plaintiff would not have had to climb onto the load to remove the strap and accordingly would not have exposed himself to the risk of injury from the crane's ball.

Section 1 of the Structural Work Act (Ill. Rev. Stat. 1971, ch. 48, par. 60) requires, among other things, that "all scaffolds, * * * ladders, supports or other mechanical contrivances, erected or constructed by any person, firm or corporation in this State for the use in the erection, * * * of any * * * building, * * * shall be erected and constructed, in a safe, suitable and proper manner, * * * [so] as to give proper and adequate protection to the life and limb of any person or persons employed or engaged thereon * * *." Section 9 of the Act (Ill. Rev. Stat. 1971, ch. 48, par. 69) provides that "Any owner, contractor, sub-contractor, foreman or other person *having charge of* the erection, construction, repairing, alteration, removal or painting of any building, bridge, viaduct or other structure within the provisions of this act, shall comply with all the terms thereof * * *." (Emphasis added.) It further provides that "For any injury to person or property, occasioned by any wilful violations of this act, or wilful failure to comply with any of its provisions, a right of action shall accrue to the party injured, * * *."

It is of no moment that the alleged violation of the Act in the instant case stems from a failure to provide a scaffold or planking since it has long been recognized that the failure to provide scaffolding can be the basis of a cause of action under the Structural Work Act. *Louis v. Barenfanger* (1968), 39 Ill. 2d 445, 449, 236 N.E.2d 724, *cert. denied* (1968), 393 U.S. 935, 21 L. Ed. 2d 271, 89 S. Ct. 296.

The defendant School District contends that there was insufficient evidence adduced at trial to support a jury verdict necessarily based upon a finding that it "had charge of" the construction work within the meaning of the Structural Work Act and that therefore the trial court should have entered judgment notwithstanding the verdict. The School District also maintains that a judgment *n.o.v.* was required since the plaintiff failed to prove that the defendant had actual or constructive knowledge of the alleged violation so as to make its failure to act a "wilful" violation of the statute.

We believe the paramount question for resolution is whether the School District, owner of the premises, was an owner having charge of the work within the meaning of the Structural Work Act.

■█ Our supreme court in its recent opinion, *McGovern v. Standish* (1976), 65 Ill. 2d 54, 357 N.E.2d 1134, enunciated essential rules applicable to a determination of whether a defendant was in charge of the work in a scaffolding case. Although *McGovern* was concerned with whether an architect was in charge of the work, its pronouncements apply as well to an owner-defendant since the threshold issue, no matter who the defendant is, is whether that party was in charge of the work. (*McGovern v. Standish; Gannon v. Chicago, Milwaukee, St. Paul & Pacific Ry. Co.* (1961), 22 Ill. 2d 305, 175 N.E.2d 785.) Architects and owners are in particularly similar positions in this respect since neither one usually is involved in directing the day to day method or means of performing the construction work. As the court stated in *McGovern*:

> "[B]efore a defendant may be found to be in charge of the work, there must be a showing that he had some direct connection with the construction operations. (*Larson v. Commonwealth Edison Co.*, 33 Ill. 2d 316, 324.) In addition, the defendant must have been in charge of the particular operations which involved the violation from which the alleged injury arose. *Warren v. Meeker*, 55 Ill. 2d 108, 111; *Carruthers v. B. C. Christopher & Co.*, 57 Ill. 2d 376, 378." 65 Ill. 2d 54, 67, 357 N.E.2d 1134, 1141.

The *McGovern* court reversed a judgment entered on a jury verdict in favor of plaintiff and against the defendant architect, finding that all the evidence considered in the light most favorable to the plaintiff so overwhelmingly favored the defendant that it was error for the trial court to deny defendant's motion for judgment notwithstanding the verdict.

The evidence in *McGovern* revealed that the defendant architect never directed the manner or method by which the construction of the hospital addition involved was accomplished. Under contracts between the owner and architect and the contractor, the defendant architect was directed to supervise the construction and was given the power to inspect all material and workmanship in order to fulfill his obligation to endeavor to guard the owner against defects and deficiencies in the work. Provisions of the contract with the contractor provided that all safety provisions of applicable laws were to be observed and that in the event an emergency threatening the safety of life presented itself, the contractor should act in whatever manner he felt appropriate. By this same contract, if the contractor was guilty of a substantial violation of any provision of the contract (presumably including provisions for adherence to safety laws), the owner, upon the certificate of the architect that sufficient cause existed to justify such action, could by ten days notice terminate the employment of the contractor and his right to proceed on all or any part of the work.

The supreme court there held that *Miller v. DeWitt* (1967), 37 Ill. 2d 273, 226 N.E.2d 630, did not stand for the proposition that the right to stop

the work, without more, is conclusive in resolving the question whether a person had charge of the work within the meaning of the Act, rather such determination must rest upon an assessment of the totality of the circumstances. In concluding that to hold defendant Standish to be in charge of the work on the facts there present would be to subject him to liability as a result of his status as a supervising architect alone, a burden not directed by the Act, the court found: (1) that the instant clause concerning termination did not permit the type of immediate cessation or suspension or activity contemplated by *Miller v. DeWitt*; (2) that the defendant did not have any "broad and sweeping" power over the work, such as the right to compel discharge of workmen and to suspend the work, as did the defendant in *Voss v. Kingdon & Naven, Inc.* (1975), 60 Ill. 2d 520, 527, 328 N.E.2d 297; and (3) that the duty to supervise the work, including the ancillary right to inspect, merely creates a duty to see that the building when constructed meets the plans and specifications contracted for. The court held that the rights to supervise and inspect, as afforded defendant Standish in *McGovern*, could not alone form a basis for a finding of coverage under the Structural Work Act.

██ It must also be kept in mind that to hold an owner liable under section 9 of the Act (Ill. Rev. Stat. 1971, ch. 48, par. 69), the owner must have some direct connection with the work out of which the violation arose over and above mere ownership, inspection of the work or the employment of an independent contractor. *Crothers v. La Salle Institute* (1976), 40 Ill. App. 3d 984, 991, 353 N.E.2d 114, and cases cited therein. See also *McGovern v. Standish* (1976), 65 Ill. 2d 54, 70, 357 N.E.2d 1134.

The evidence in the instant case reveals that the architect for the School District's project was the primary judge of the acceptability of the work performed by R and R Construction or its subcontractors. Under his contract, the architect was to make periodic visits to the site to inspect the progress of the work in order to endeavor to guard the School District from defects or deficiencies in the work of the contractors; however, he was not responsible for any failure of the contractors to carry out the work in accordance with the contract documents.

The School District utilized Mr. William Delaney, a man of considerable experience in the construction trade, as its "clerk of the works." Mr. Delaney was generally at the site each day work was done for part of the day. He engaged in inspecting and observing the progress of the work on the average of 1½ to 2 hours per day. His right to do such was pursuant to a supplemental general condition of the contract of R and R Construction which provided that the owner, as well as the architect, should at all times have access to the work for inspection purposes. According to Mr. Delaney's testimony, his duties in June of 1971 were to

record the progress of the job, to inspect finished work for conformity with the plans and specifications and to act as liaison between the architect and contractor. Although the plaintiff argues that Mr. Delaney, as clerk of the works, had a "staff" of 10 to 12 people working under him, the record reveals that these School District employees were engaged only on a short term basis in assembling and storing furniture and equipment received at the vocational building and moving bleachers around in a gymnasium in order to clear an area for construction work. They had nothing at all to do with the construction work.

Mr. Delaney further testified that he never read the provisions in the contract of R and R Construction relating to safety. The relevant safety provisions of record demonstrate that R and R Construction was responsible for job safety and that it was required to comply with all applicable safety laws including the Structural Work Act. Another contract provision provides that in the event any of the provisions of the contract are violated by the contractor or any of his subcontractors, the owner may serve written notice upon the general contractor of its intention to terminate the contract. By this provision, if the violation does not cease or if suitable correction or arrangement is not made within a 10-day period, the contract is terminated at the expiration of such period. However, from the testimony of Jack Olsen, the architect who wrote the contract, and the architect's contract, it appears that even if Mr. Delaney were to see something he considered to be a Structural Work Act violation, he would first have to consult with the architect to determine if a violation existed and then give the 10-day notice of intention to terminate.

Although some concrete work that was substandard apparently was replaced at the behest of the owner and architect, it is uncontradicted that neither William Delaney nor the architect ever told anyone how or when to perform any part of the construction work. Moreover, there is no evidence that the School District had any extraordinary power, such as the right to direct the removal of any workmen of the contractor.

After considering all the evidence in its light most favorable to plaintiff Norton, and in view of *McGovern v. Standish* and cases dealing with owner liability under the Act (*e.g., Loveless v. American Telephone & Telegraph Co.* (1963), 40 Ill. App. 2d 347, 189 N.E.2d 679; *Emberton v. State Farm Mutual Automobile Insurance Co.* (1976), 44 Ill. App. 3d 839, 358 N.E.2d 1254; *Melvin v. Thompson* (1963), 39 Ill. App. 2d 413, 188 N.E.2d 497), we find that the trial court erred in not entering judgment notwithstanding the verdict since the evidence so overwhelmingly favors defendant on this decisive issue that no contrary verdict based on the evidence could ever stand. (*Pedrick v. Peoria & Eastern R.R. Co.* (1967),

37 Ill. 2d 494, 229 N.E.2d 504.) Accordingly, we reverse the judgment of the trial court. To hold defendant liable in this instance would be to impose liability upon the School District for being a mere owner, albeit an owner interested in the quality of its new building. There is insufficient direct connection between the owner and the work to impose liability under the Structural Work Act.

■■ Initially, we note that no representative of the owner ever directed the method or means by which any phase of construction, including the spotting of roofing materials, was to be done. Liability is basically sought to be imposed because of the defendant's powers to inspect the work and terminate the contract if a contractor violated the Structural Work Act (Ill. Rev. Stat. 1971, ch. 48, par. 60 *et seq.*) Neither of these powers when taken alone can form the basis for finding one in charge of the work. (*McGovern v. Standish* (1976), 65 Ill. 2d 54, 69; *Emberton v. State Farm Mutual Automobile Insurance Co.* (1976), 44 Ill. App. 3d 839, 843; *Fandrich v. Allstate Insurance Co.* (1974), 25 Ill. App. 3d 301, 315, 322 N.E.2d 843 (right of inspection); and *McGovern v. Standish* (1976), 65 Ill. 2d 54, 69 (right to stop work).) We believe that under the facts of this case these two powers taken together, are insufficient to support a finding that the School District had charge of the work.

The right to inspect work to ensure that it is of the quality desired and requested is a basic and inherent right of the owner of a premises as a mere owner. Even if we were to infer from the inclusion of specific safety standards in the contract of R and R Construction and the retention in the defendant of the right to inspect the work that the defendant was obligated to inspect for violations of the Structural Work Act or, at least, possessed such power, we would find that the limited right defendant had to cause a termination of the contract does not supply sufficient control over the work to support a finding that it had charge of the work. As noted in *McGovern*, a clause allowing the stoppage of work only upon 10 days notice does not permit the type of immediate cessation or suspension of activity contemplated by *Miller v. DeWitt*, which power is in itself not conclusive of the question at hand. Moreover, the instant defendant's ability to invoke even this limited power is further diluted by the necessity of a prior consultation with its architect.

For the foregoing reasons, we reverse the judgment of the circuit court of Madison County in favor of plaintiff. In view of our holding, it is not necessary to consider defendant's other contentions relative to the necessity of a new trial.

Reversed.

EBERSPACHER, J., concurs.

Mr. JUSTICE GEORGE J. MORAN, dissenting:

Under the rationale of *Larson v. Commonwealth Edison Co.*, 33 Ill. 2d 316, 211 N.E.2d 247, the question of whether the defendant was in charge of the work in question was a question of fact for the jury. In *Larson* members of the defendant's construction crew were on the job at all times. They did not exercise any control over the work but merely inspected to see that the terms and specifications of the contract were carried out.

Under these facts the supreme court held that whether the defendant was in charge of the work involved was a question of fact for the jury to determine. In *Larson* the supreme court said:

> "In the *Gannon* case, (22 Ill. 2d 305,) where it was expressly noted that the owner involved had 'exercised no control over the manner in which the work was being done,' (p. 307) we held that an owner must have some direct connection with the operations, over and above mere ownership or the employment of an independent contractor, and indicated that the question whether the particular connections and activities in a given case were such that an owner could be deemed to have charge was a question of fact for the jury to determine. Nothing in Gannon suggests or holds that either the exercise of supervision and control, or the retention of the right to do so, are essential ingredients for having charge. And manifestly, the plain language of the statute does not limit duty and liability to owners retaining control and supervision of the work as the instruction suggests. The inclusion of the words 'by retaining supervision and control of the work' placed a greater burden on plaintiff than the law required and was improper." (33 Ill. 2d 316, 322-23.)

I take this statement to mean that if the owner has any substantial direct connection with the work in addition to ownership, the question of whether he is in charge is one for the jury. *Beebe v. Commonwealth Edison Co.*, 45 Ill. App. 3d 43, 358 N.E.2d 1343; *Carlson v. Metropolitan Sanitary District*, 64 Ill. App. 2d 331, 213 N.E.2d 129; *McInerney v. Hasbrook Construction Co.*, 62 Ill. 2d 93, 338 N.E.2d 868.

The evidence discloses that the degree of participation in the work by the defendant in this case was more than sufficient to satisfy the *Larson* test.

William Delaney was employed by the defendant as a clerk of the works for construction of the new high school and also as supervisor of construction for the Collinsville School District. He testified under cross-examination by plaintiff's attorney that he served as liaison between the architect and the contractor. He kept track of the number of employees on the job, checked on the quality of the work and generally saw to it that

the work was done in accordance with the plans and specifications. He maintained an office adjacent to that of the general contractor and kept a complete set of plans and specifications in his possession at all times.

He was on the job every day and spent one-half to two hours inspecting the work. If he found anything wrong with the work, he would report to the architect and then he and the architect would have a conference as to whether the work was to be accepted or rejected. There were many meetings between him, the architect, the general contractor and the subcontractors. He testified that there were regular meetings for clarification of work on the job and also to ascertain the amount of draw that could be made by the contractor for a particular month.

Jack E. Olsen testified that he was vice president of the Architectural Associates, Inc., who were the architects for the building of the vocational education building for the Collinsville School District. He identified the contractor documents and stated that the agreement between the owner and the contractor pertained to the specifications and plans for the area vocational school. His firm would inspect the premises approximately one day a week. He and Delaney would prepare reports regularly on the progress of the job and report to the school board at their regular meetings.

"Q. And who was in charge of the work for the school district?
A. The Clerk of the Works.
Q. And that is Mr. Jack Delaney?
A. Mr. Bill Delaney."

He defined the duties of the clerk of the works in the following language:

"The Clerk of the Works, basically, I'll go back to the contract between the owner and the architect, depending on the size of the project, whether it's in say millions of dollars or what have you, and the complexity of it, the owner has the right to actually have a representative at the job site during construction, essentially to protect his interest. And the job of the Clerk of the Works, essentially is to assure that the contract documents, the materials that are used, the method of detailing, the number of reinforcing bars, the strength of the concrete and so forth, is placed in accordance with the plans and specifications as prepared by the architect. And this essentially is his job, to really check the quantities and uh, number of bars and so forth, type of construction.

* * *

Q. I say Mr. Delaney's definition of what a Clerk of the Works duties are would be as good as your definition, wouldn't it, sir?

A. I don't think so, since actually the duties were discussed at each interview.

Q. Those duties we're talking about, Mr. Delaney indicated he was asked to make a head count, report temperature and report those materials or that matter into the architect, did you hear him say that?

A. That's correct.

Q. Was that correct as to what his duties were?

A. I don't think it was complete in that he gave a report as to what transpired during the day, work in place, what was worked on and what part of the building and so forth. And also he documented any problems that arose on the job.

❋ ❋ ❋

Q. And normally somebody supervises construction for the owner?

A. It depends on the job.

Q. And in this job, who supervised the construction for the owners?

A. The Clerk of the Works, Mr. Delaney.

Q. And the school had the right to inspect for safety, did it not?

A. Yes sir."

Orville Meadows, a labor steward on the job, testified that Delaney was overseer for the Collinsville Unit School District on the job and that he would be there daily.

Ellsworth Hellman testified that he was a laborer on the job and employed by the general contractor. His duties were to get the subgrade ready for a concrete pour. He testified that there were some subgrades that had to be redone because of a high water table on the project and that this was done at the direction of Delaney.

The owner in this case was also given a great deal of control over the work by certain provisions in the contract, such as:

"14. REPORTS, RECORDS AND DATA

    a. The Contractor shall submit to the Owner such schedule of quantities and costs, progress schedules, payrolls, reports, estimates, records and other data as the Owner may request concerning work performed or to be performed under this Contract.

15. SUPERINTENDENCE BY CONTRACTOR

    a. At the site of the work, the Contractor shall employ a construction superintendent or foreman who shall have full authority to act for the Contractor. It is understood that such representative shall be acceptable to the Architect and shall be one who can be continued in that capacity for the particular job involved unless he ceases to be on the Contractor's payroll.

## 16. CHANGES IN WORK

a. No changes in the work covered by the approved Contract Documents shall be made without having prior written approval of the Owner.

\* \* \*

## 19. CORRECTION OF WORK

a. All work, all materials, whether incorporated in the work or not, all processes of manufacture, and all methods of construction shall be at all times and places subject to observation of the Architect who shall be the final judge of the quality and suitability of the work, materials, process of manufacture, and methods of construction for the purposes for which they are used. Should they fail to meet his approval they shall be forthwith reconstructed, made good, replaced and/or corrected, as the case may be, by the Contractor at his own expense.

\* \* \*

## 24. PAYMENTS TO CONTRACTOR

d. The architect may withhold or, on account of subsequently discovered evidence, nullify the whole or a part of any certificate to such extent as the Architect may deem to be necessary to protect the Owner from loss on account of:

\* \* \*

## 33. SUBCONTRACTING

b. The Contractor shall not award any work to any subcontractor without prior written approval of the Owner, which approval will not be given until the Contractor submits to the Owner a written statement concerning the proposed award to the subcontractor, which statement shall contain such information as the Owner may require.

## 34. SUBCONTRACTS

a. The bidder is specifically advised that any person, firm or the party to whom it is proposed to award a subcontract under this Contract must be acceptable to the Owner and Architect.

\* \* \*

e. The Owner and the Architect shall at all times have access to the work wherever it is in preparation. The Contractor shall provide proper and safe facilities for such access and for inspection.

\* \* \*

F. Use of Site and Site Practices: The work must be scheduled to afford a minimum of inconvenience to or interference with, the normal and continuous use by the Owner of the existing facilities, services and utilities, and the areas adjacent thereto in which the work is to be performed. Interruption of utilities and services shall be performed in accordance with the schedule approved by the Owner and Architect.

3. Rubbish shall be removed from the site in a manner approved by the Architect and Owner, in accordance with this Article and at such times that a nuisance will not be created.

❄ ❄ ❄

5. The Contractor shall confine his construction equipment, the storage of materials and the operations of workmen to the limits indicated by laws, ordinances, permits and as may be established by the Architect and Owner, and shall not unreasonably encumber the premises with construction equipment or materials.

6. The Contractor shall enforce the Architect's and Owner's instructions regarding sign, advertisements, fires and smoking.

❄ ❄ ❄

I. Emergencies: In an emergency affecting the safety of life, the work, or adjoining property; the Contractor, without special instructions or authorization from the Architect or Owner, is permitted to act at his discretion.

❄ ❄ ❄

15B-03 SUPERVISION AND COOPERATION:

(a) All work must be done to the complete approval of the Architect, and there shall be no deviation from these plans or specifications without his written approval.

❄ ❄ ❄

16A-02 SCOPE OF WORK:

(i) The Electrical Contractor shall not scale the plans but shall check all measurements at the building and adjust his work to fit the space allotted for same. Close cooperation between all trades will be required. Any work done by this Contractor without regard for the work of other crafts shall be moved, at the option of the Owner, as part of the electrical work, without extra charge to permit the proper installation of other work.

(j) The Owner shall have the right to relocate, within a ten foot radius without additional cost to the Owner.

* * *

16A-05 DEFINITIONS:

(a) Whenever in these contract documents the words 'as ordered', 'as directed', 'as required', 'as allowed', or words or phrases of like importance are used, it shall be understood that the order, direction, requirement, permission, or allowance of the Owner is intended."

The power given to the owner and its architect agent under this contract was broad and sweeping. That power was fully exercised by the owner while the work was being performed. The owner through its construction superintendent was on top of the job at all times. He regularly consulted with the architect about work problems and both of them met regularly with the general contractor. Delaney also reported regularly to the defendant about the progress of the work. In my opinion, the question of whether the defendant was in charge of the work was for the jury.