(No. 50066.—

IRVIN L. NORTON, Appellant, v. WILBUR WAGGONER EQUIPMENT RENTAL AND EXCAVATING CO. *et al.* (Collinsville Community Unit District No. 10, Appellee).

*Opinion filed July 19, 1979.—Rehearing denied September 28, 1979.*

RYAN, J., dissenting.

Earl L. Vaugniaux, of Edwardsville, and William J. Harte, Ltd., of Chicago, for appellant.

Robert W. Wilson, R. Frederick Melin, and Ross T. Anderson, of Burroughs, Simpson, Wilson, Hepler, Broom

& McCarthy, of Edwardsville, for appellee.

Nat P. Ozmon, of Horwitz, Anesi, Ozmon & Associates, Ltd., of Chicago (Nat P. Ozmon and Mark Novak, of counsel), for *amicus curiae* International Association of Bridge, Structural and Ornamental Iron Workers Local Union No. 1.

MR. JUSTICE CLARK delivered the opinion of the court:

The plaintiff, Irvin L. Norton, filed an action against the defendants, Collinsville Community Unit District No. 10 (hereafter the school district), Architectural Associates, Inc. (hereafter the architect), and Wilbur Waggoner Equipment Rental and Excavating Co., under the Structural Work Act (Ill. Rev. Stat. 1971, ch. 48, par. 60 *et seq.*), in the circuit court of Madison County for injuries he sustained while working on the construction of a new school building. Waggoner and the architect were dismissed without prejudice by plaintiff during trial. Norton contended that the defendant school district, as owner, was liable under the Act as a person "having charge" of the erection of the building (Ill. Rev. Stat. 1971, ch. 48, par. 69). A jury returned a verdict for plaintiff for $175,000. The appellate court reversed on that issue alone with one justice dissenting (52 Ill. App. 3d 442), and we granted the plaintiff leave to appeal.

At the time of the injury, Norton was employed by R & R Construction Company, the general contractor for the project. In order to complete the construction of one of the buildings (E), a crane was used to lift large bundles of roofing material to the top of the building, where they were deposited on the bar joists located 22 feet above the floor level. Hoisting straps were attached to a hook, 8 to 10 inches long, which was immediately beneath a steel "headache ball," 10 to 12 inches in diameter and weighing

80 to 100 pounds, at the end of the crane's cable. Once these bundles were placed across the bar joists, which had no scaffolding beneath them, Norton would walk or crawl out on the bar joists or on the bundle itself, disconnect the hoisting straps, and drop them to the ground. On June 25, 1971, Norton crawled onto a bundle of roofing material to disconnect the hoisting straps. The crane operator, acting on relayed signals, inadvertently lowered the "headache ball" and hook onto his back. Within a short time he experienced severe pain and was taken to a doctor's office.

The issue on appeal is whether the defendant school district was an owner having charge of the erection so as to render it liable for violations of the Structural Work Act; that is, for failure to "provide planking or scaffolding" for the plaintiff to stand on. (See Ill. Rev. Stat. 1971, ch. 48, par. 60.) Section 9 of the Act provides:

> "Any owner, contractor, sub-contractor, foreman or other person having charge of the erection, [or] construction *** of any building, *** within the provisions of this act, shall comply with all the terms thereof ***.
>
> * * *
>
> For any injury to person *** occasioned by any wilful violations of this act, or wilful failure to comply with any of its provisions, a right of action shall accrue to the party injured, for any direct damages sustained thereby ***." (Ill. Rev. Stat. 1971, ch. 48, par. 69.)

A duty is placed upon each class of persons in the statute only if such person or persons has charge of the work. (*Gannon v. Chicago, Milwaukee, St. Paul & Pacific Ry. Co.* (1961), 22 Ill. 2d 305, 323, overruling *Kennerly v. Shell Oil Co.* (1958), 13 Ill. 2d 431.) The question of who has charge of the construction is a question of fact for the jury. (*Gannon v. Chicago, Milwaukee, St. Paul & Pacific Ry. Co.* (1961), 22 Ill. 2d 305, 323; *Crothers v. La Salle Institute* (1977), 68 Ill. 2d 399, 406.) Moreover, this court has determined that the term "having charge of" should not be defined for the jury because it is "one of common

usage and understanding, and \*\*\* further attempt at definition can only lead to confusion and error." (*Larson v. Commonwealth Edison Co.* (1965), 33 Ill. 2d 316, 323.) Hence Illinois Pattern Jury Instructions Civil, section 180.16 (2d ed. 1971), provides for no such instruction. It is true there may be insufficient evidence to create a factual question of whether a defendant has charge of the work. A trial court's decision on a motion for judgment notwithstanding the verdict or for a directed verdict, necessitating a review of the evidence, may show as much. However, reversal of a jury verdict in favor of the plaintiff must be supported by evidence, which, when viewed most favorably to the plaintiff, nevertheless so overwhelmingly favored the school district that no contrary verdict could stand. (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510.) Application of the *Pedrick* test supports the trial court's denial of the school district's motions for a directed verdict, judgment *n.o.v.*, and dictates reversal of the appellate court.

William Delaney was employed by the school district as "Clerk of the Works for the construction" involved here (and as the supervisor of maintenance or of buildings and grounds generally for the school district) at the time of the accident. Under section 60 of the Civil Practice Act (Ill. Rev. Stat. 1971, ch. 110, par. 60), he testified that his duties were to record the progress of the construction, inspect the construction, serve as liaison between the architect and contractor, and take "a head count" of the workers. He was expected "to keep the contractor honest" by making certain all specifications were met, he said. Delaney also testified he had an office at the site but no staff, was there five days a week but not for the whole day, and had weekly meetings with the architect, contractor and subcontractors but safety was never discussed. An experienced contractor himself, Delaney stated he was familiar with the bar joists at the site, having been on them

35 to 40 times, and had been on the bar joists on which plaintiff was injured a few times himself. He said no safety superintendent was appointed, and no safety meetings or discussions were ever held. He also said any changes he felt necessary had to be reported to the architect in order to effect them.

Jack E. Olsen, associated with the architect, testified (also under section 60 of the Civil Practice Act (Ill. Rev. Stat. 1971, ch. 110, par. 60)) that the school board had the right to inspect the construction, including for safety, and employed a "Clerk of the Works," Delaney. The clerk, Olsen stated, "supervised the construction for the owners"; reported, jointly with the architect, to the school district at its board meetings on the progress of the construction; made certain that contractual specifications were met; and was familiar with construction methods. Olsen said the clerk would be the first to know of any deviations and would report them to the architect. He also testified that the school board could terminate the contract between it and the contractor although it had to provide 10 days' notice to the contractor. Acting on behalf of the school board, the architect, Olsen further testified, could inspect the works and was "the final judge of the quality and suitability of the work."

Testimony by others shows Delaney had significant supervisory input into the construction, such as having work redone at his direction.

The contract between the school district and contractor, and the documents constituting it, provided that the contractor would be responsible for safety on the construction site and for appointing a safety superintendent. The contract also provided that the owner had to be given reports and records of the work from the contractor such as the owner requested; the owner had to give prior written approval for all changes in work; the owner could order extra work or make changes; the owner could

determine whether the date of completion should be extended; the owner had to have access to the work at all times; and the owner and the architect could establish limits on the operations of workmen.

The school district, citing *McGovern v. Standish* (1976), 65 Ill. 2d 54, and acknowledging *Emberton v. State Farm Mutual Auto Insurance Co.*(1978), 71 Ill. 2d 111, among other cases, contends that its association with the construction on its property was that of mere ownership and nothing more. It supports its contention by noting it could not "stop" work on the construction other than by giving 10 days' notice to the contractor, and by arguing it had no direct connection with the construction operations, was not in charge of the particular operations which involved the violation resulting in the injury, and lacked "the ability to put safety measures in force."

While it is true that mere ownership, without more, is insufficient to establish liability under the Structural Work Act (*Gannon v. Chicago, Milwaukee, St. Paul & Pacific Ry. Co.* (1961), 22 Ill. 2d 305, 319-20; *Kiszkan v. Texas Co.* (1961), 22 Ill. 2d 326, 329; *Warren v. Meeker* (1973), 55 Ill. 2d 108, 111 (where the owners-lessors were found not to be liable for injuries under the Structural Work Act because they did not commission the repair work and accordingly were not in charge)), retention of supervision and control of the work by the owner is not essential to establish liability. This court in *Larson v. Commonwealth Edison Co.* (1965), 33 Ill. 2d 316, 321-22, stated:

> "While it may be conceded that some of the decisions in this jurisdiction involving the Scaffold Act appear to have equated 'having charge' with 'supervision and control' in varying degrees, it is our opinion the language of the statute, and the legislative intent it reflects, do not permit the conclusion that the terms are the inflexible and unbending legal equivalent of the other. The *term*

*'having charge of' is a generic term of broad import, and although it may include supervision and control, it is not confined to it.* As was said of the word 'charge' in *People v. Gould* 345 Ill. 288, 323: 'The word does not necessarily include custody, control or restraint, and its meaning must be determined by the associations and circumstances surrounding its use. "To have charge of" does not necessarily imply more than to care for or to have the care of.' \*\*\*. *[C]onsistent with its beneficent purpose of preventing injury to persons employed in the extra-hazardous occupation of structural work, the thrust of the statute is not confined to those who perform, or supervise, or control, or who retain the right to supervise and control, the actual work from which the injury arises, but, to insure maximum protection, is made to extend to owners and others who have charge of the erection or alteration of any building or structure.*" (Emphasis added.)

The court added that "the plain language of the statute does not limit duty and liability to owners retaining control and supervision of the work." 33 Ill. 2d 316, 322.

In *McGovern,* the plaintiff filed suit against the architect for injuries sustained in a fall from a scaffold used in construction which, plaintiff alleged, the architect was in charge of under the Structural Work Act. This court held that a defendant "must have been in charge of the particular operations which involved the violation from which the alleged injury arose" (65 Ill. 2d 54, 67), and found for the architect on the basis of at least three evidentiary factors. First, the architect did not have the right to stop the work, as contemplated by *Miller v. DeWitt* (1967), 37 Ill. 2d 273, 284, 286, because stoppage could only occur upon 10 days' notice. Second, the

architect's right to supervise, together with the ancillary right to inspect, was simply a duty to see that contractual specifications were met. Third, the architect's authority was not broad or sweeping (as in *Voss v. Kingdon & Naven, Inc.* (1975), 60 Ill. 2d 520, where the defendant had authority to discharge workers and suspend work). Several observations are necessary. First, *Emberton v. State Farm Mutual Automobile Insurance Co.* (1978), 71 Ill. 2d 111, 119, clarified *McGovern's* rule regarding a defendant's control of "the particular operations," above: "If the language in the majority opinion in *McGovern* was intended to mean that *it may be shown* that a person was 'in charge of the particular operations which involved the violation from which the alleged injury arose' (65 Ill. 2d 54, 67) either by proof that he exercised control, or that the right to control the work existed, whether exercised or not, it correctly states the law." (Emphasis added.) Second, as the *McGovern* court noted, the right to stop the work is not "conclusive in resolving the question of whether a person has charge of the work within the meaning of the Act. [Citations.] Rather, such a determination must rest upon an *assessment of the totality of the circumstances.*" (Emphasis added.) (65 Ill. 2d 54, 68.) Third, in the case before us, the school district could do more than merely see that contractual plans and specifications were met. It could order changes; had to approve changes; ordered, through Delaney, that certain work had to be redone; served as liaison, through Delaney, between the contractor and architect; and had an office at the site and was there, through Delaney, five days a week. Fourth, the school district's authority may not have been as expansive as in *Voss,* above, but it was much more so than this court found in *McGovern,* where evidence showed the defendant never exercised control over the work.

In *Emberton,* an employee of the general contractor was injured while moving a portable scaffold. This court

found the architect and the defendant State Farm, owner of the site, in charge of the construction: all employees of State Farm made frequent inspections of the construction; although State Farm denied having control, its assistant vice-president for building design frequently visited the construction site; and State Farm ordered periodic changes. Here, the contractor performed all the construction work but Delaney made daily inspections for the school district and, according to testimony, had work redone at his direction. Here too, the school district had the contractual competence to order changes and had to approve changes.

Our review of the evidence demonstrates retention of supervision and control of the construction by the school district. Even if that were not so, assessment of the totality of the circumstances shows the school district was sufficiently in charge of the construction to justify a finding of liability. Delaney daily made inspections and had work redone. He was generally familiar with construction methods and specifically familiar with the bar joists; hence, he was in a peculiarly appropriate position to be the "first one to know if there is some deviation" and have it alleviated, either at his direction or through the architect. Although the inability to "stop" the work or terminate a contract before the lapse of 10 days might be decisive in another case, it is not here. We find from the evidence this is not a case in which "the manner of doing the work was left up" entirely to the contractor. *Carruthers v. B. C. Christopher & Co.* (1974), 57 Ill. 2d 376, 378.

Given the evidence and applying the law above, we cannot say that, under the *Pedrick* test, the evidence so overwhelmingly favored the school district as to justify reversal of the jury verdicts and trial court. Furthermore, the evidence was such that reasonable people could disagree about whether the school district was in charge of the work (*Crothers v. La Salle Institute* (1977), 68 Ill. 2d

399, 406-07). For these reasons, we reverse the judgment of the appellate court and remand the cause to it for consideration of other issues raised in that court but not decided by it.

*Reversed and remanded,*
*with directions.*

MR. JUSTICE RYAN, dissenting:

A substantial part of this dissent was incorporated in the opinion originally adopted by this court. However, upon rehearing being allowed, the opinion that has now been filed as the majority opinion was adopted. I must dissent from that opinion because I believe that the construction it has placed on the Structural Work Act (Ill. Rev. Stat. 1971, ch. 48, par. 60 *et seq.*) does not tend to promote, but may, in fact, defeat the stated purpose of the Act and may lead to some very inequitable results as will be more fully developed later in this dissent. So that what I consider to be the construction of the Act that must be adopted to achieve its stated purpose may be fully presented, I restate in this dissent much of that which I had incorporated in the original opinion filed in this case.

As noted in the majority opinion, this court has heretofore stated that "having charge of" was a term of common usage and understanding and need not be defined. (*Larson v. Commonwealth Edison Co.* (1965), 33 Ill. 2d 316, 323.) That statement by this court was obviously erroneous because, since it was made, there has been a substantial amount of litigation concerning the question of whether a defendant was a person "having charge" within the meaning of the Act. A cursory examination of the cases cited in the majority opinion, and those cited in this dissent (by no means an exhaustive list of all the cases in which this issue was involved), reveals that this court has been asked to pass on this question on numerous occasions.

Although this court did state in *Larson* that "having charge" was a term of common understanding and needed no definition, the many cases that this court has decided involving that question have nonetheless fairly well carved out a definition or an understanding of that term for the guidance of the court, as later discussed herein. The majority now abandons this understanding of the term and finds that evidence of a minimal contact with a project, for whatever purpose, will support a verdict against an owner.

Because I am not in complete agreement with the majority opinion's conclusion as to the facts which the evidence establishes, I incorporate herein, as I did in the original opinion, my understanding of the facts as they are contained in the record.

The school district employed William Delaney as clerk of the works for the building project. The contract between the school and the architect does not state what duties the clerk of the works was to perform, or whether he was to make any inspections or recommendations as to safety procedures. Also, the documents which constitute the contract between the school district and the general contractor do not specify the duties or the authority of the clerk of the works. The contract between the school district and the architect provides that the architect shall make decisions on all claims of the owner (school district) and the contractor and on all matters relating to the execution and the progress of the work, or the interpretation of the contract documents. It further provides that the owner (school district) shall observe the procedure of issuing orders to contractors only through the architect, and that if the owner observes, or becomes aware of, any defect in the project, he shall give prompt written notice thereof to the architect.

According to Delaney's testimony at trial, he had been employed in the building trades for most of his life, and at the time of the accident was employed as both the clerk of

the works on this building project and as superintendent of maintenance generally for the school district. In his capacity as clerk of the works, he was at the construction site on an average of five days a week and attended weekly progress meetings with the architect and contractors, and generally acted as a liaison between the architect and the contractor. Delaney testified that he felt it was his job to "keep the contractors honest" by inspecting the work to ensure contract compliance insofar as specifications and work progess were concerned. He also stated that his primary interest was to have the job properly completed as quickly as possible in accordance with the specifications. Delaney testified that he had never read the complete contract documents and that he was unaware if they referred to safety codes or if the owner had the contractual right to terminate the contract. He never inspected for safety, never held safety meetings, never discussed safety, and had no knowledge of scaffolding safety regulations. He admitted that he had been upon the bar joists and knew that the men had to work on them without the benefit of flooring, planking, or scaffolds. Delaney made his reports directly to the architect. If he found a nonconformity or problem with the work, he reported it to the architect, and the architect would point the problem out to the contractor. The architect had the duty of ensuring contract compliance by the contractors. Work changes were made by the architects on occasion, and cost changes were approved by the school board. It appears that, on at least one occasion, Delaney himself required that some subgrade work be redone.

A member of the firm of architects, Jack E. Olsen, also testified at trial. He testified that his firm made weekly inspections and that reports to the school board were usually prepared jointly with Delaney. He described Delaney's job as ensuring that the proper materials were used and that the construction conformed to the contract.

The architect was the final judge of the quality and suitability of the work and methods of construction. Any directions given to the contractors by the architect were made on behalf of the school district. He also testified that the defendant school district had the right to terminate the contract between the school district and the general contractor, after 10 days' notice, if the contractor failed to comply with the specifications. According to both Delaney and Olsen, Delaney would first bring any problem to the architect's attention. If the architect determined that a contract violation existed, he would then inform the contractor to correct it. If the problem was not corrected within 10 days, the owner could terminate the contract.

The documents which constituted the contract between the school district and the general contractor incorporate all relevant laws, ordinances, and regulations concerning construction, and the contractor specifically agreed to comply with the standard safety manual, "Manual of Accident Prevention in Construction," published by the Associated General Contractors of America, Inc. Several specific provisions in the contract read as follows:

> "The Contractor alone shall be responsible for the safety, efficiency, and adequacy of his plant, appliances, and methods, and for any damage which may result from their failure or their improper construction maintenance, or operation."

> "The Contractor shall employ methods of construction or erection, and hoists, rigging, forms, scaffolding, cribbing, tools, temporary structures, etc., at the site of the work which satisfy or exceed the requirements of the American Standard Safety Code for Building Construction published by the USASI and of local, State and Federal safety laws, and building codes, including but not limited to the 'Structural Work Act' Illinois Revised Statutes 1967, Chapter 48, Sections 60 through 69."

> "The Contractor shall designate a responsible representative at the job site as a Safety Superintendent who shall

be responsible for the promotion of safety and prevention of accidents, and shall enforce all applicable laws, ordinances, codes, rules, regulations and standards pertaining to safety and prevention of accidents. The Safety Superintendent shall hold bi-weekly meetings with the representatives of the various trades employed at the job site in order to insure that all employees understand and comply with the laws, regulations, etc., hereinbefore set forth."

The contract also specifically reserved to the owner the right to access and inspection of the work. All changes in work covered by the contract also had to be approved in writing by the owner. The contract further provided:

"In the event that any of the provisions of this Contract are violated by the Contractor, *** the Owner may serve written notice upon the Contractor and the Surety of its intention to terminate the Contract, such notices to contain the reasons for such intention to terminate the Contract, and unless within ten (10) days after the serving of such notice upon the Contractor, such violation or delay shall cease and satisfactory arrangement of correction be made, the Contract shall upon the expiration of said ten (10) days, cease and terminate."

Plaintiff contends, and the majority opinion holds, that the clerk of the works was the representative of the school district on the construction project and that his activities constituted sufficient participation in the construction of the building to bring the school district within the meaning of a person "having charge," as that term is used in the Structural Work Act. Plaintiff also contends that the contractual authority of the school district to terminate the contract for contractual violations gave it the power to enforce safety regulations by stopping work for nonperformance. Plaintiff argues that the power of an owner to stop work has been held by this court to be an important indicia of whether the owner is a person "having charge" within the meaning of the Act.

In *Kennerly v. Shell Oil Co.* (1958), 13 Ill. 2d 431,

this court construed the Structural Work Act as imposing upon the owners and others named in the Act a nondelegable duty of compliance, and held that the duty of each is independent of the other and that neither can escape his statutory liability by pointing to the other's breach of duty.

In *Gannon v. Chicago, Milwaukee, St. Paul & Pacific Ry. Co.* (1961), 22 Ill. 2d 305, this court again considered the nature of the duty imposed by the Structural Work Act and noted that since the decision in *Kennerly* the courts had construed the Act as imposing absolute liability in civil cases upon each of the persons named in the Act and had held that control of the activities involved was not a relevant factor. However, in reviewing the history of the Act and considering its language, this court, in *Gannon,* concluded that the Act did not place a nondelegable duty of compliance upon each class of persons named in the Act but only imposed a duty upon such persons who could be said to be those "having charge" of the work. The court then stated:

> "[B]efore civil liability may be imposed upon the defendant owner under section 9 of the act, it must appear that he had charge of the construction operations involving the violation." 22 Ill. 2d 305, 323.

The language last quoted from *Gannon* was carried forward and applied in *Larson v. Commonwealth Edison Co.* (1965), 33 Ill. 2d 316, 323, *Carruthers v. B. C. Christopher & Co.* (1974), 57 Ill. 2d 376, 378, *Warren v. Meeker* (1973), 55 Ill. 2d 108, and *McGovern v. Standish* (1976), 65 Ill. 2d 54, 67. Owners of construction projects against whom damages are sought under section 9 regularly urge a narrow interpretation of this language and argue that it absolves them from liability under the Act unless they are in charge of the particular phase of the operation or activity from which the injury arose. However, in

*Emberton v. State Farm Mutual Automobile Insurance Co.* (1978), 71 Ill. 2d 111, this court held that such a narrow interpretation of this language of *Gannon* is not acceptable. Also, it should be noted that such a narrow interpretation of the language is not consistent with the language of Illinois Pattern Jury Instructions, Civil, No. 180.02 (2d ed. 1971), which informs the jury that it is possible for more than one person to "have charge of" the work. One or more persons can have charge of the overall work and others can have charge of the phase of the work in connection with which the injury occurs. This instruction conforms with the holdings of this court in *Miller v. DeWitt* (1967), 37 Ill. 2d 273, *Li Petri v. Turner Construction Co.* (1967), 36 Ill. 2d 597, and *Larson v. Commonwealth Edison Co.* (1965), 33 Ill. 2d 316.

Thus, although *Gannon* held that liability under the Act cannot be imposed upon an owner solely by virtue of ownership of the property, nonetheless, the term "having charge of" cannot be given such a narrow meaning as to require the owner to have control or supervision, or to be in charge of the particular phase of the operation from which the injury arose. The degree of involvement by the owner required to support liability under the Act lies in the range between these two poles.

In *Larson* this court, relying on *Gannon,* noted that whether the particular connections and activities of an owner in a given case were such that the owner could be deemed to have charge of the work was a question of fact for the jury to determine. This court has been consistent in its holdings to that effect. (*Kobus v. Formfit Co.* (1966), 35 Ill. 2d 533; *Voss v. Kingdon & Naven, Inc.* (1975), 60 Ill. 2d 520; *McInerney v. Hasbrook Construction Co.* (1975), 62 Ill. 2d 93; *Crothers v. La Salle Institute* (1977), 68 Ill. 2d 399.) This does not mean, however, that in every case the issue must be submitted to a jury for its determination regardless of the quantum or nature of the

evidence. A court must review the evidence on this issue, as on any issue of fact, in passing on a motion for judgment *n.o.v.* or for a new trial. This court has on numerous occasions held that the pleadings or the evidence disclosed no facts from which a jury could find that a defendant was a person having charge of the work. In *Kiszkan v. Texas Co.* (1961), 22 Ill. 2d 326, an opinion filed the same day as the opinion in *Gannon,* this court held that summary judgment in favor of the defendant owner was proper since the pleadings and affidavits disclosed "not a scintilla of evidence that the defendant owner had charge of the construction." (22 Ill. 2d 326, 330.) In *Huckabee v. Bell & Howell, Inc.* (1970), 47 Ill. 2d 153, this court held that a directed verdict for the defendant should have been entered. The defendant was the owner and supplier of the scaffold; however, this court held that he was not in charge of the work and that a verdict for the plaintiff under the Structural Work Act was properly reversed by the appellate court. In *Warren v. Meeker* (1973), 55 Ill. 2d 108, this court affirmed the dismissal of a complaint since the allegations did not show that the defendant was a person in charge of the operation which involved the violation from which the injury arose. In *Carruthers v. B. C. Christopher & Co.* (1974), 57 Ill. 2d 376, this court held that summary judgment in favor of the defendant was proper where the affidavits filed in support of defendant's motion showed that the defendant was not in charge of the work in question. In *McGovern v. Standish* (1976), 65 Ill. 2d 54, this court affirmed the appellate court's reversal of a verdict in favor of the plaintiff because the evidence, judged by the *Pedrick* standard (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510), did not show that the defendant was in charge of the work.

   *Gannon,* while recognizing that the purpose of the Structural Work Act was to reduce the hazards of

particularly hazardous work to the fullest possible extent, refused to place an absolute nondelegable duty on the class of persons named to accomplish that end. The court held that it could not ignore the unambiguous words of the statute placing civil responsibility only on those having charge of the work. Thus, since the nondelegable-duty construction of the Act announced in *Kennerly* was reversed in *Gannon,* this court, through its decisions, has favored a logical meaning of the term "having charge of" which, as noted below, can be best understood by relating the meaning to the accomplishment of the purpose of the Act. The majority opinion in this case now retreats from that logical definition to a position perilously close to the nondelegable-duty construction of *Kennerly.*

This court has on many occasions referred to the beneficent purpose of the Act. In the early case of *Schultz v. Henry Ericsson Co.* (1914), 264 Ill. 156, 164, this court stated that the object to be attained by this statute was to prevent injury to persons employed in this dangerous and extrahazardous occupation. In *Larson* this court stated that the purpose of the Act was to prevent injury to persons employed in the extrahazardous occupation of structural work, and, consistent with this purpose, the thrust of the statute is not confined to those who control the actual work from which the injury arose but, to insure maximum protection, extends to owners and others who have charge of the erection of the structure. In *Kobus v. Formfit Co.,* the court again pointed out that the purpose of the Act is to protect persons engaged in extrahazardous work and therefore places the burden upon those "having charge of" the construction. Also, in *McNellis v. Combustion Engineering, Inc.* (1974), 58 Ill. 2d 146, this court again stated that the purpose of the Act is to protect persons engaged in extrahazardous occupations of working in and about the construction of buildings. The very title of the Act specifically states that the Act is "for the

protection and safety of persons in and about the construction \*\*\* of buildings, \*\*\* and to provide for the enforcement thereof." (Ill. Rev. Stat. 1971, ch. 48, par. 60 (title of act).) Thus the Act must be applied in such a manner as to effectuate its purpose. Since its title also states that it provides for the enforcement of its purpose, the civil damages provision of section 9 must be applied to that end.

The brief filed by the International Association of Bridge, Structural and Ornamental Iron Workers Local Union No. 1, as *amicus curiae,* urges that this court apply the Act to effectuate its stated purpose. However, the *amicus* argues that the owners are very much in charge of *all* construction projects and therefore the purpose of the Act could be accomplished by broadly imposing civil liability under section 9 upon the owners. Although I agree that the Act should be applied to accomplish its purpose, responsibility of an owner cannot be predicated on ownership alone. This has been the interpretation of the Act since this court's decision in *Gannon,* and the plain language of the Act imposing civil liability upon those "having charge of" the work must be given meaning. In New York, that State's equivalent of our Structural Work Act required that for an owner or a general contractor to be liable it had to exercise some degree of control or supervision of the work. However, in 1969 the Act was amended by the legislature, placing a nondelegable duty upon owners and general contractors and imposing absolute liability upon them for a breach of these duties regardless of their control or supervision. (*Allen v. Cloutier Construction Corp.* (1978), 44 N.Y.2d 290, 376 N.E.2d 1276, 405 N.Y.S.2d 630.) If the purpose of our act can be more effectively promoted by placing a nondelegable duty upon an owner, as the *amicus* urges, the plain language of our act must be changed by legislative action as it was in New York.

In order to promote the safety of those for whose protection the Act was adopted, it is necessary that the term "having charge" in some way relate to the safety of the operation out of which the injury arose. If the purpose of the Act is to protect persons engaged in the construction industry, liability under section 9 should be imposed upon those who are in a position to improve the safety of the operation.

Since this court in *Gannon* rejected the nondelegable-duty concept, it is only in this sense that section 9, the enforcement provision, can be used to accomplish the purpose of the Act. Oregon's Employers' Liability Law (Ore. Rev. Stat. sec. 654.305 (1977)) places the duty to use "every device, care and precaution" for the protection of employees upon "all owners, contractors or subcontractors and other persons *having charge of,*" or responsibility for, any work involving a risk or danger to employees. (Emphasis added.) In *Wilson v. Portland General Electric Co.* (1968), 252 Ore. 385, 448 P.2d 562, the court noted that the term "having charge of" had been construed to involve retained control of a project by the owner. The court stated that the purpose of the Oregon act is to provide maximum protection for workmen engaged in hazardous occupations. "Therefore, before the retained right of control by an owner should give rise to liability, that retained right of control should bear some relation to the creation of a risk of danger to workmen resulting from dangerous working conditions." (252 Ore. 385, 395-96, 448 P.2d 562, 567.) The Oregon court also noted that there were various aspects of retained control by an owner in a construction project and that an owner may exercise control for certain purposes and still not be a person "in charge of" the work within the meaning of the statute. This is comparable to the observation in *Gannon* and in *Larson* that there are various phases of a construction project over which different persons may be in charge

insofar as the Act is concerned, and as noted in *Larson*, the owner must have charge of the work involved in a particular contract out of which the injury arose. In *Gannon* this court noted that the Act imposed civil liability only for "wilful violation" and stated that wilful violation means knowing violation and concluded that this could be perpetrated only by persons directly connected with the operation. (22 Ill. 2d 305, 321.) I would hold, as did the Oregon Supreme Court, that, in order to provide the maximum protection for workmen in the hazardous occupation of structural work, the imposition of civil liability under our act should bear some relation to the accomplishment of the stated purpose of the Act.

The previous decisions of this court have been consistent with the accomplishment of this end. This court has held that the supervision and control of the work or the right to do so, although not necessary or conclusive factors for liability under the statute, are, nonetheless, factors bearing on the ultimate question whether an owner is in charge. (*Larson v. Commonwealth Edison Co.* (1965), 33 Ill. 2d 305, 322.) Thus, in cases where the owner has acted as the general contractor, coordinating and directing the work of the various subcontractors, this court has held that the evidence was sufficient to support a finding that the owner was in charge of the work. (*McInerney v. Hasbrook Construction Co.* (1975), 62 Ill. 2d 93; see also *Kobus v. Formfit Co.* (1966), 35 Ill. 2d 533.) In *Larson,* in addition to a provision in the contract that the work was to be done under the general supervision and to the satisfaction of the owner's station construction department, regular meetings were held by the owner to coordinate the work and representatives of the owner's safety department regularly visited the construction site and could make safety suggestions. In these cases the supervision and control of the owners, or their right to do so, were considered relevant factors.

In *Gannon* and *Emberton,* as well as in *Larson,* large construction projects were involved and the owners were large companies with special departments in charge of the planning and construction of buildings. Regular inspections were made by the owners, and they maintained a staff of employees who participated in various phases of the planning and execution of the contract. By virtue of the ongoing activities of the owners in these cases, they were in a position to enhance the safety of the various phases of the work, and thus this court held that their participation created a question of fact as to whether the owner was a person "having charge." The constant participation in the "ongoing activities" of the construction project has been considered evidence of whether an owner is in charge of the work. In *Warren v. Meeker* this court, in distinguishing cases cited by the plaintiff in support of its claim against an owner, noted that, "[i]n each, the party against whom liability was asserted participated to some extent in an ongoing activity protected by the Act." 55 Ill. 2d 108, 112.

This court has generally considered the authority of the owner to stop the work as important evidence that the owner was in charge. The authority to do so, of course, demonstrates that the owner is in a position to promote the safety of the workers by stopping the work, when a safety violation is observed, for the protection of those who may be injured if the violation continues. In *Emberton,* in addition to the extensive participation by the owner noted above, we pointed out that on several occasions the owner had directed the architect to issue stop work orders (71 Ill. 2d 111, 121). In *Kobus,* this court felt that a significant factor in that case was the authority of the architect to stop work if necessary to ensure proper execution of the contract. In *Miller v. DeWitt* this court emphasized the authority of the architect to interfere with or even to stop the work if he

thought it was being performed in an unsafe manner. In *Voss* it was again pointed out that the defendant could suspend the work and remove the workers from the job. In *McNellis,* in addition to other extensive authority over the performance of the work, this court also stated that the owner had the right to stop the work if it was not being done safely.

Thus, in the cases in which this court has held that whether the defendant was a person "having charge" was a question of fact, there was evidence of the defendant's involvement in the construction project to a degree that enabled it to promote the safety of the workers. Imposing civil liability upon the defendants in those cases was therefore in furtherance of the purpose of the Act and aided in its enforcement. Also, in the cases in which this court has held that no questions of fact were presented, the defendants were not in positions to effectuate the purpose of the Act. They were found not to be persons "having charge" and were held not to be liable for civil liability under section 9. (*Huckabee v. Bell & Howell, Inc.* (1970), 47 Ill. 2d 153; *Warren v. Meeker* (1973), 55 Ill. 2d 108; *Carruthers v. B. C. Christopher & Co.* (1974), 57 Ill. 2d 376; *McGovern v. Standish* (1976), 65 Ill. 2d 54.) In the present case I find insufficient involvement by the school district to create a question of fact as to whether it was in charge of the work from which the injury arose.

Plaintiff acknowledges that this court has consistently viewed the right to stop work as significant. He therefore argues that the school district in this case had the authority to stop the work. There is no such authority in either the owner's contract with the architect or in the owner's contract with the contractor that gives the owner or the architect the authority to stop the work. The plaintiff equates the owner's authority stated in the contract to terminate the contract for violations of its terms with authority to stop work. This provision of the

contract would have been of no help in protecting the plaintiff from the dangerous practices which brought about his injury. Under the contract the owner, through the clerk of the works, had the right to inspect the construction. Assuming it was the duty of the clerk of the works to inspect for safety violations (the majority cites this fact as evidence of the owner "having charge"), when the clerk of the works observed what he thought was a safety violation, the contract required that he communicate this to the architect. It was then within the discretion of the architect to make a determination as to whether or not there was a violation of the contract. If the architect decided that there was in fact a contract violation, the contract required that a 10-day notice of the violation be given to the contractor, who then would have 10 days within which to correct it. This is not the type of retained authority which an owner must have to prevent injury to the workers or to protect them from hazardous construction practices. To protect the workers from injury, the owner must have authority to act at once upon the observation of a safety violation. If this delayed type of procedure is sufficient involvement to make an owner responsible under the Act, it would permit the imposition of civil liability upon an owner who had no authority to prevent the dangerous practices. A vast number of safety violations are of short duration. In this case, the hoisting of the roofing material to the bar joists lasted only a few days. If a contractor were given 10 days to correct the practice, the same could continue for that period, all the time constituting a danger to the workers, and if a worker were injured within that period the owner would be held responsible for a practice he could not prevent. Imposing civil liability on the owner in such a situation will not further the purpose of the Act. In *McGovern* this court discussed the difference between the right to stop work in the cases which have held that factor to be important and

a delayed right to terminate the contract, as we have in this case. This court there held that the delayed right to terminate the contract was not comparable to the right to stop work if it is being performed in a dangerous manner.

Also, in this case the school district, through the clerk of the works and the architect, did not involve itself in the safety aspect of the construction in any manner. No inspections for safety violations were made. No safety meetings were attended by the clerk of the works or any representative of the owner, no safety suggestions were made to the contractor, and no discussion concerning safety was had with the contractor. The clerk of the works inspected only to see that the proper materials were used and that their installation conformed to the specifications in the contract. The plaintiff argues that the facts in this case are very similar to those in *Emberton.* The majority opinion seems to accept this contention. I do not agree. There is simply no comparison between the involvement of a school district, which has designated its superintendent of maintenance as the clerk of the works, with the involvement of State Farm Mutual Automobile Insurance Company in *Emberton.* The insurance company was a large organization which maintained a separate department to deal with the design and construction of buildings for the company. This department had 24 employees. It did the preliminary layout for the construction of the building involved in *Emberton,* and various employees of the company, from time to time, inspected the building. One hundred twenty-seven change orders were issued at the direction of the company, and at various times it directed the architect to issue stop work orders. (*Emberton v. State Farm Mutual Automobile Insurance Co.* (1978), 71 Ill. 2d 111, 120-21.) In this case not only is there absent the authority to stop work that was present in *Emberton,* but also there is no involvement of the owner to the extent that it could influence the safety practices of the contrac-

tor; nor was there any attempt by the owner to do so. As noted in *Emberton,* the owner's involvements in that case were as extensive as they were in *Gannon.* By contrast, in this case the owner was represented by a clerk of the works who inspected the premises solely to ensure that the proper materials were installed in the manner specified in the contract. As the clerk stated, he was to "keep the contractor honest" and see that the owner received the quality and quantity of material that it was paying for. In none of the cases where this court has held that the evidence created a question of fact as to whether the owner was in charge of the work has there been as little participation in the construction activities by the defend-ant owner as we have by the school district in this case. To extend liability to the owner here does not further the purposes of the Act.

Except for the fact that holding an owner-builder with so little involvement responsible does not further the purpose of the Act, I am not too worried about the responsibility imposed by this interpretation of the Act when a sophisticated owner-builder is involved, because he is usually able to protect himself from the consequences of such an interpretation through insurance or construction indemnity bonds. (See *Capua v. W. E. O'Neil Construction Co.* (1977), 67 Ill. 2d 255.) However, the same interpreta-tion must be given to the Act when the owner is a small businessman, a farmer, or a homeowner who engages a contractor to repair the roof, build a shed, or paint a house. These people are not sophisticated builders who are protected by insurance or construction indemnity bonds. They know nothing of safety standards and probably have never heard of the Structural Work Act. It just does not seem to be within the contemplation of the Act that they should be held to be persons "having charge of" the work simply because they may point out to a contractor, for example, a spot on the house that one of the painters

failed to paint.

I am also concerned that, because of recent statutory enactments and decisions of this court, the effect of the majority opinion may be to place the ultimate burden for the wrongdoing of the contractor upon an owner who has only minimal contact with the construction. In *Miller v. DeWitt* (1967), 37 Ill. 2d 273, this court pointed out that under the Workmen's Compensation Act (Ill. Rev. Stat. 1977, ch. 48, par. 138.5(b)) the employer who pays compensation may be reimbursed when the injured employee recovers from another. In our case this would enable the employer-contractor who had undertaken complete responsibility for complying with safety standards and the Structural Work Act to recover compensation payments made to plaintiff out of plaintiff's recovery from the school district. However, in *Miller v. DeWitt* this court also held that a person responsible because of the Structural Work Act could maintain a third-party action for indemnity against the wrongdoing employer on the active-passive negligence theory. Otherwise, the *Miller* court held, if the third party, who has not been guilty of active negligence, cannot succeed in an action against an employer who has been guilty of active negligence, the third party will be made to bear the ultimate burden of loss which should fall upon the employer. (*Miller v. DeWitt* (1967), 37 Ill. 2d 273, 289.) Thus, in our case, the indemnity theory would presumably allow the school district-owner, which is held responsible under the Structural Work Act, to seek indemnity from the contractor-employer on the active-passive negligence theory. At the same time the employer could seek reimbursement under the Workmen's Compensation Act for compensation payments. This circular approach—reimbursement plus indemnity—placed the responsibility upon the party whose conduct caused the injury. As long as the circle remains intact the burden of the injury would be placed upon the party whose conduct

caused it. However, I am fearful that the indemnity segment of the circle has been weakened, if not broken.

In holding that such a right of indemnity existed, *Miller v. DeWitt* relied on an earlier decision of this court in *John Griffiths & Son Co. v. National Fireproofing Co.* (1923), 310 Ill. 331. Although *Griffiths* involved an express agreement by a subcontractor to indemnify the contractor and owner, the *Miller* court held that it was proper to recognize the right of indemnity even in the absence of an express agreement. In *Griffiths* it was contended that such an agreement violated public policy because it was an undertaking to indemnify the contractor against liability occasioned by his own wrongdoing—the violation of the Structural Work Act. The *Griffiths* court, after discussing other types of cases in which indemnity had been permitted on the basis of active-passive negligence, concluded that an agreement to indemnify one for liability occasioned by his violation of the Structural Work Act did not violate public policy.

Subsequent to this court's decision in *Miller v. DeWitt* the General Assembly enacted "An Act in relation to indemnity in certain contracts" effective September 23, 1971. Section 1 of this act (Ill. Rev. Stat. 1971, ch. 29, par. 61) provides that, with respect to contracts or agreements dealing with construction, *"every *** agreement to indemnify *** another person for that person's own negligence is void as against public policy ***."* (Emphasis added.) In *Davis v. Commonwealth Edison Co.* (1975), 61 Ill. 2d 494, this court held that this statute rendered void and unenforceable an undertaking by a general contractor to indemnify an architect for claims arising out of the architect's violation of the Structural Work Act. This court held that the word "negligence" in the statute encompasses violation of the Structural Work Act and also noted that, although *Griffiths* held that such indemnity agreements would not violate public policy, the

legislative enactment declared and changed public policy on this subject. It must be noted that the legislature declared *every* agreement to indemnify another for his own negligence violated public policy. It did not limit the application of the statute only to cases involving indemnification of a person who has been *actively* negligent. This court, in *Davis,* applied the public policy as expressed in the statute without regard to whether the architect, who sought indemnity under the agreement, was actively or passively negligent.

If a passively negligent person in a construction case cannot shift his responsibility to an actively negligent person by use of an indemnity agreement, what then is the effect of this expression of public policy on shifting the same responsibility under the active-passive negligence theory? In *Davis* this court, in justifying the expressed public policy against indemnity agreements in construction contracts, stated that the legislature may have considered that the use of such agreements may remove or reduce the incentive to protect workers from injury. That case further noted that a person having charge of the work and thus liable for violation of the Structural Work Act, having arranged the avoidance of the burden of liability, would no longer have the same motivation to lessen the extent of the danger. (*Davis v. Commonwealth Edison Co.* (1975), 61 Ill. 2d 494, 499.) (This, of course, assumes that the person "having charge of" is in a position to lessen the extent of the dangers, which, as noted earlier, I contend should be the construction placed upon the Structural Work Act.) The same reasoning would apply to one who is able to shift the burden of responsibility for his violation of the Structural Work Act to another by virtue of the active-passive indemnity theory. He, too, would not be motivated to lessen the extent of the danger.

Although some may view the active-passive theory of indemnity as still viable (see Guy, *Trends In Third-Party*

*Practices,* 65 Ill. B.J. 448, 449 (1977)), this court has not had the occasion to consider the question. In the past this court has not distinguished between the contract theory of indemnity and indemnity based on the tort theory (see *Miller* and *Griffiths*). Logic would seem to require that if it is against public policy to shift the burden of a Structural Work Act violation by an express agreement, it must also be against public policy to do so by virtue of active-passive negligence. It would be anomalous to hold that an owner "having charge" of construction in one count of a complaint could not maintain an action for indemnity against a contractor based on an expressed agreement to indemnify because that agreement violates public policy, but the same owner could, in another count of the complaint, seek exactly the same results based on active-passive negligence.

It thus appears that the extremely liberal interpretation placed upon the phrase "having charge of" by the majority opinion, and the interaction of the Structural Work Act with other statutory enactments and decisions of this court, may have the effect of placing the ultimate responsibility for the wrongdoing of a contractor-employer upon an owner who could be said to be only "passively negligent." The contractor-employer would thus suffer no penalty for using dangerous construction methods but would, in effect, benefit by being relieved of the additional costs of conforming to safety standards. This result would seem to me to encourage the use of hazardous construction practices, thus defeating the stated purpose of the Structural Work Act.

To avoid such a result, that is, in order to reestablish the indemnity segment of the circle, this court will have to devise, in future decisions, a new fiction which will hold that an owner cannot shift his responsibility to the employer under an expressed indemnity agreement because it violates public policy, but can somehow, nonethe-

less, accomplish this same result under the active-passive negligence fiction. The latter fiction in itself has been described as "the active/passive muddle" and as having become "logically and semantically unintelligible." (Guy, *Trends In Third-Party Practices*, 65 Ill. B.J. 448, 449 (1977).) I am afraid that the majority opinion's liberal construction of "having charge," and the interaction of that construction with other statutory provisions and previous decisions of this court, seriously undermine the purpose for which the Structural Work Act was adopted, which was not to compensate the injured worker (this being the purpose of the Workmen's Compensation Act), but to promote safety.

I would hold that as a matter of law the school district is not a "person having charge" within the meaning of the Structural Work Act.